## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED** | ) ) | |
| | ) | **Civil Action File No.** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **ERIK BJERKE, JEFFREY CROWELL, CHAD PIGG FIFE, EMILY FLETCHER, BRITTANY HARTNETT, KEVIN HIGGINBOTHAM, JAMES KAUFMAN, JEFFREY NEUMEYER, STEVEN PREDILETTO, JOSEPH SACCO, MICHAEL SONTAG, ELIZABETH WHITE, OPENARC CORPORATE ADVISORY, LLC, DYNASTY FINANCIAL PARTNERS, LLC and CHARLES SCHWAB & CO., INC.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

---

## PLAINTIFF'S VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

---

COMES Plaintiff Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") brings this Verified Complaint against Defendants Erik Bjerke, Jeffrey Crowell, Chad Pigg Fife,[1] Emily Fletcher, Brittany Hartnett, Kevin Higginbotham,

---

[1] Fife formerly went by the name Chad Pigg.

1

James Kaufman, Jeffrey Neumeyer, Steven Prediletto, Joseph Sacco, Michael Sontag, and Elizabeth White (together, the "Individual Defendants"), OpenArc Corporate Advisory, LLC ("OpenArc"), Dynasty Financial Partners, LLC ("Dynasty"), and Charles Schwab & Co., Inc. ("Schwab") (together, the "Corporate Defendants"), and alleges as follows:

## <u>INTRODUCTION</u>

1.     Merrill brings this Verified Complaint to prevent the culmination of a pre-meditated corporate raid of its Atlanta-based Global Corporate and Institutional Advisory Services ("GCIAS") business, planned and executed by its former employees and their corporate co-conspirators.

2.     Merrill's GCIAS business provides equity compensation services, retirement benefit plans, and institutional consulting to ultra-high net worth individuals, national and multi-national businesses, and institutional investors across numerous sectors.

3.     GCIAS is comprised of a dedicated group of 90 financial advisors and 80 operational professionals.   Upon information and belief, the Individual Defendants and the Corporate Defendants have been collaborating to divert the GCIAS business from Merrill and open a Dynasty and Schwab-affiliated Registered Investment Adviser ("RIA"). Upon information and belief, the new RIA has been incorporated using the name "OpenArc."

4.     Therefore, Merrill seeks the Court's assistance to preserve the status quo and to halt Defendants' tortious and unlawful conduct. Through the spread of misinformation and strong-arm tactics, the Defendants already have conspired to poach Merrill's GCIAS business, including 170 financial advisors and support staff assigned to support GCIAS, and thousands of corporate and individual customers receiving services from or through GCIAS.

5.     Without exercise of the Court's equitable powers, Defendants' misconduct will cause continued, serious, and irreparable harm to Merrill. Defendants have intentionally and willfully misappropriated Merrill's proprietary information and trade secrets, interfered with and jeopardized Merrill's relationships with its clients and employees, and harmed Merrill's goodwill and reputation.

6.     Defendants already have forced Merrill to expend significant resources to combat their unfair and unlawful conduct. They have willfully violated contractual obligations and federal and state laws for the purpose of depriving Merrill of the value of its substantial investments in its proprietary information and employees, thereby harming Merrill.

7.     Accordingly, Merrill seeks immediate injunctive relief to enjoin Defendants from engaging in their unlawful conduct and to prevent the imminent and irreparable harm that Merrill will suffer absent such necessary and appropriate relief.

## PARTIES

8.    Merrill is one of the nation's foremost securities brokerage firms. It is organized and exists under the laws of the State of Delaware with a principal place of business at 250 Vesey Street, New York, New York, 10080.  Merrill transacts business in this judicial district in multiple locations, including the GCIAS office located at 3455 Peachtree Road N.E., Suite 200, Atlanta, Georgia 30326 ("Peachtree Office"), where the Individual Defendants were assigned to work until their mass resignation.

9.    Defendant Dynasty is a registered investment advisory firm incorporated under the laws of Delaware with a principal place of business at 200 Central Avenue, 15th Floor, St. Petersburg, Florida 33701. Dynasty maintains multiple locations in this District and within the state of Georgia.

10.    Defendant Schwab is a securities brokerage firm incorporated under the laws of Texas with its principal place of business at 3000 Schwab Way, Westlake, Texas 76262.  Schwab maintains several branch locations in this District and within the state of Georgia.

11.    Defendant OpenArc is a limited liability company incorporated under the laws of Delaware with its principal place of business in Atlanta, Georgia.  On information and belief, its members are some or all of the Individual Defendants, and each of the Individual Defendants is now an employee of OpenArc.

4

12. Until abruptly resigning on September 23, 2025, Individual Defendant Erik M. Bjerke was a Managing Director and senior leader in Merrill's GCIAS group and had been employed by Merrill for 27 years. Upon information and belief, Bjerke is a current member and employee of OpenArc. Bjerke resides in Georgia, with a home located at 459 Blackland Road NW, Atlanta, Georgia 30342.

13. Until abruptly resigning on September 23, 2025, Individual Defendant Jeffrey K. Crowell was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 12 years. Upon information and belief, Crowell is a current member and employee of OpenArc. Crowell resides in Georgia, with a home located at 4223 Blackland Drive, Marietta, Georgia 30067.

14. Until abruptly resigning on September 23, 2025, Individual Defendant Chad A. Pigg Fife was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 19 years. Upon information and belief, Fife is a current member and employee of OpenArc. Fife resides in Georgia, with a home located at 721 Longleaf Drive NE, Unit 3, Atlanta, Georgia 30342.

15. Until abruptly resigning on September 23, 2025, Individual Defendant Emily Fletcher was a Managing Director, senior partner, and "COO" for Merrill's GCIAS group and had been employed by Merrill for 30 years. Upon information and belief, Fletcher is a current member and employee of OpenArc. Fletcher resides in Georgia, with a home located at 289 Carriage Avenue, Jefferson, Georgia 30549.

5

16.     Until abruptly resigning on September 23, 2025, Individual Defendant Brittany L. Hartnett was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 16 years.  Upon information and belief, Hartnett is a current member and employee of OpenArc.  Hartnett resides in Georgia, with a home located at 1125 Lullwater Road, Atlanta, Georgia 30307.

17.     Until abruptly resigning on September 23, 2025, Individual Defendant Kevin W. Higginbotham was a Managing Director and a leader of Merrill's GCIAS group and had been employed by Merrill for 26 years.  Upon information and belief, Higginbotham is a current member and employee of OpenArc.  Higginbotham resides in Georgia, with a home located at 840 Vista Bluff Drive, Johns Creek, Georgia 30097.

18.     Until abruptly resigning on September 23, 2025, Individual Defendant James R. Kaufman was a Managing Director and self-denoted "senior leader" in Merrill's GCIAS group and had been employed by Merrill for 26 years.[2]  Upon information and belief, Kaufman is a current member and employee of OpenArc. Kaufman resides in Georgia, with a home located at 4315 Lakehaven Drive NE, Atlanta, Georgia 30319.

---

[2] See James Kaufman | LinkedIn, available at https://www.linkedin.com/in/james-kaufman-6161185, last accessed September 23, 2025.

19.     Until abruptly resigning on September 23, 2025, Individual Defendant Jeffrey S. Neumeyer was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 24 years.  Upon information and belief, Neumeyer is a current member and employee of OpenArc.  Neumeyer resides in Georgia, with a home located at 355 Glen Lake Drive, Atlanta, Georgia 30327.

20.     Until abruptly resigning on September 23, 2025, Individual Defendant Steven R. Prediletto was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 25 years.  Upon information and belief, Prediletto is a current member and employee of OpenArc.  Prediletto resides in Georgia, with a home located at 2609 Apple Valley Road, Atlanta, Georgia 30319.

21.     Until abruptly resigning on September 23, 2025, Individual Defendant Joseph A. Sacco was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 31 years.  Upon information and belief, Sacco is a current member and employee of OpenArc.  Sacco was assigned to and worked out of Merrill's Peachtree Office, but resides in New Jersey, with a home located at 2528 Woodland Avenue, South Plainfield, New Jersey 07080.

22.     Until abruptly resigning on September 23, 2025, Defendant Michael C. Sontag was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 19 years.  Upon information and belief, Sontag is a current

member and employee of OpenArc.  Sontag resides in Georgia, with a home located at 3274 Windsor Lake Drive NE, Atlanta, Georgia 30319.

23.     Until abruptly resigning on September 23, 2025, Individual Defendant Elizabeth G. White was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 17 years.  Upon information and belief, White is a current member and employee of OpenArc.  White resides in Georgia, with a home located at 2327 Shenandoah Avenue NE, Atlanta, Georgia 30305.

## JURISDICTION AND VENUE

24.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Merrill asserts claims arising under the laws of the United States. Specifically, Merrill asserts claims against Defendants under the Defend Trade Secrets Act ("DTSA").  See 18 U.S.C. § 1836(b)(1).

25.     The Court has supplemental jurisdiction over Merrill's state law claims pursuant to 28 U.S.C. § 1367.

26.     The Individual Defendants are subject to the general personal jurisdiction of this Court because they are Georgia residents (or Georgia workers, in the case of Sacco).  See ¶¶12-23.

27.     The Corporate Defendants are subject to the specific personal jurisdiction of this Court because they purposefully availed themselves of

conducting business in Georgia and the injuries they inflicted upon Merrill occurred in Georgia.  See ¶¶9-11.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Merrill's claims against Defendants occurred in this District. Defendants have engaged in unlawful trade practices, tortious conduct, and contractual breaches against Merrill in this District.

## FACTUAL ALLEGATIONS

### A. The Origins of GCIAS

29.    Merrill is the investment and wealth management division of Bank of America (collectively, Merrill and its Bank of America affiliates are the "Company").  Merrill employs more than 17,000 employees, who service the comprehensive needs of high and ultra-high net worth individuals, families, and businesses in more than 500 offices across 100 U.S. markets.

30.    As part of the wealth management services that Merrill provides to its clients, Merrill maintains several "specialty" practice groups, the largest of which is GCIAS.  Headed by a group of senior members, including Individual Defendants Bjerke, Crowell, Fife, Fletcher, Hartnett, Higginbotham, Kaufman, Neumeyer, Prediletto, Sacco, Sontag, and White, GCIAS is comprised of 90 financial advisors who provide Merrill-affiliated products and services to certain corporations and

certain individuals across the globe. Including support staff, Merrill employs approximately 170 people in GCIAS.

31. GCIAS services Merrill clients that include U.S. and international corporations, ultra-high net worth and mass affluent individuals and families, and institutions that range in size from small businesses to large, multi-national conglomerates.

32. Working with GCIAS creates a unique opportunity for financial advisors to service distinct types of clients: (a) the 401(k), RSU, stock benefit, or other retirement or equity plans sponsored by corporations and institutions (the "Plans"); and (b) the individual executives and employees who participate in retirement, benefit, or other plans sponsored by a corporate client of Merrill (the "downstream accounts").

33. The financial advisors with GCIAS derive significant compensation from the opportunity to convert Plan participants into downstream accounts.

34. Notably, unlike many financial advisors at Merrill, those with GCIAS are *given existing* client relationships to service and expand; they are not required or expected to source the clients themselves.

35. The Individual Defendants typically did not prospect new clients. Instead, they generated six- and seven-figure incomes from the downstream business

derived from institutional clients already working with Merrill and internal referrals of potential clients from other segments of the Company.

36.     The Individual Defendants conspired with the Corporate Defendants to solicit both the Plans and the downstream accounts.

**B. The Individual Defendants Received Access to Confidential and Proprietary Information, Which They Promised to Safeguard.**

37.     During their training and employment with Merrill, financial advisors and operational professionals with GCIAS, and firm-wide, receive access to substantial amounts of confidential and proprietary information.

38.     This information includes compiled client information, client lists, client account names and numbers, investment strategies and objectives, risk tolerances, current investments, and past revenues and rates of return, existing or forthcoming products and services, and strategic business plans.

39.     Because of its unique role, Merrill also allows GCIAS access to certain non-public confidential data and information entrusted to Merrill by certain corporate and institutional clients, so that Merrill can manage the clients' compensation and stock benefit plans. GCIAS, including the Individual Defendants, receives access to this information *in addition to* the confidential data that Merrill safeguards for all of its clients.

40.    For obvious reasons, the confidential and proprietary information belonging both to Merrill and to its corporate and institutional clients is extremely valuable and not publically available.

41.    Merrill also invests millions of dollars in compiling and developing its proprietary information to protect its market position as a highly regarded wealth management firm, spending substantial funds and time to develop its proprietary information, including but not limited to its client information, client lists, and client accounts and names—all of which have taken years to develop and build.

42.    Given the significant value of and investments in developing its proprietary information, Merrill goes to great lengths to protect its confidential information, and employs a number of security measures and checks and balances to safeguard customer privacy.  Specifically, Merrill financial advisors are granted access to information only pertaining to the clients[3] they service.  Merrill locks down information systems, conducts regular surveys of outgoing data and documents, and prevents employees from inserting a flash drive or connecting an external hard drive to the system.  Merrill uses encryption protocols, complex password requirements, and double authentication requirements.

43.    The Individual Defendants were instructed and required to certify that the customer data and other confidential information and trade secrets to which they

---

[3] The terms "client" and "customer" are used interchangeably herein.

gained access during their Merrill employment were to be used <u>only</u> for the limited purposes necessary to carry out their regular duties on behalf of Merrill.

44.    These obligations were conveyed and agreed to by the Individual Defendants through the agreements they signed and the policies they acknowledged, as described further <u>infra</u>.

### C. The Individual Defendants Conspire with Dynasty and Schwab to Move GCIAS Business to a Newly Formed Dynasty-Affiliated Registered Investment Advisor (OpenArc).

45.    Dissatisfied with earning millions of dollars annually at Merrill, and while still employed at the firm, the Individual Defendants began conspiring with Dynasty and its shareholder and main custodial partner, Schwab, and taking steps to form a competitor entity, OpenArc.

46.    The Individual Defendants' and Corporate Defendants' mutual goal was to solicit all 170 Merrill employees working with GCIAS to leave Merrill, followed by the thousands of Plans and downstream accounts serviced by GCIAS, effectively diverting all of these employees and clients from Merrill's Peachtree office to OpenArc—surreptitiously and without any advance warning to Merrill.

47.    Upon information and belief, the Individual Defendants, with the help and support of the Corporate Defendants, took the following steps—all while still employed with Merrill:

       a.  founded and incorporated wealth management firm OpenArc (an RIA) to compete with Merrill;

b.  identified, leased, and began the build out of new office space to house OpenArc, under Emily Fletcher's direction;

c.  targeted senior members of GCIAS to move to OpenArc and Dynasty and then used those senior members to pitch the departure plan to junior members and support staff;

d.  held meetings in Merrill offices and at the personal residences of James Kaufman and other GCIAS employees to coordinate their departure and persuade other employees to join the move;

e.  required GCIAS employees to execute non-disclosure agreements regarding their "strategic discussions" with Kaufman, Bjerke, Fletcher, Crowell, Higginbotham and other GCIAS senior leaders, which prohibit them from discussing the planned move, in violation of their ongoing fiduciary duties and duties of loyalty owed to Merrill;

f.  offered financial and equity incentives to junior members of GCIAS to sign non-disclosure agreements and commit to the move;

g.  during meetings at GCIAS senior leaders' homes, James Kaufman, Elizabeth White, and Brittney Hartnett made Power Point pitch presentations to the captive audience, promising them equity in the business that the Defendants intended to divert from Merrill, increased compensation, and increased prestige;

h.  distributed onboarding packets to GCIAS members;

i.  used scare tactics to encourage employee departures, such as threats of lawsuits, and spread baseless rumors that Merrill would shut down GCIAS and terminate any junior level employee who remained behind; and

j.  shared confidential and proprietary information concerning Merrill employees and Merrill customers with the Corporate Defendants.

48.    While the Individual Defendants were engaged in the above conduct, and upon information and belief, Dynasty undertook some or all of the following tasks to facilitate a successful move from Merrill to OpenArc:

    a.    offered the Individual Defendants significant financial incentives to divert GCIAS business from Merrill to OpenArc and Dynasty;

    b.    encouraged the Individual Defendants to share confidential and proprietary Merrill employee information (e.g., compensation, performance, etc.) and customer information (contact information, assets under management, product preferences, etc.) to facilitate the transition;

    c.    provided guidance concerning business formation and firm structure, such as creating a legal entity, assisted in drafting operating agreements, investment advisor agreements, and determining ownership structure.[4]

    d.    initiated firm and representative registrations via the SEC Form ADV and the FINRA Form U4;

    e.    assisted with the identification of office space and the negotiation of leasing terms and office buildout; and

    f.    assisted with marketing, public relations, website development, digital and social media marketing, and on-site transition support.

49.    Exacerbating Merrill's concern that the Individual Defendants shared its trade secrets, proprietary information, and other confidential customer information with Dynasty, Dynasty's website states that it assists in reviewing and

---

[4] See Start An RIA | Dynasty Financial Partners | Wealth Management, available at https://dynastyfinancialpartners.com/advisors/start-ria/, last visited September 23, 2025.

selecting asset custodians; providing asset mapping for client holdings and money movement needs; identifying third-party money managers, structured products, and credit and lending products; and "consulting on Protocol or non-Protocol client communication options."

50.     Dynasty could not perform any of those functions without an in-depth review and comprehensive understanding of GCIAS and the thousands of corporate and downstream clients it services.

51.     Frankly, it is inconceivable that the Individual Defendants would not have shared this information with Dynasty and Schwab prior to coordinating the transition of approximately 170 employees and solicitation of significant client assets.  The nature of Merrill's GCIAS business is too complex to simply port over to another firm.

52.     The team's move to Dynasty and OpenArc is reportedly important enough to Schwab that Schwab has promised to feed the Individual Defendants corporate equity plan clients and give them access to Schwab clients.

53.     Upon information and belief, Dynasty and Schwab helped the Individual Defendants marshal approximately $90 million in capital funds for their move from GCIAS to OpenArc.

54.    While still employed by Merrill, the Individual Defendants worked together and with the Corporate Defendants to make sure that their departure to Dynasty and OpenArc would be joint, simultaneous, and disruptive.

55.    For example, upon information and belief, they discussed the best way to negatively impact Merrill's ongoing business functions in the office following their departure.

56.    Moreover, to distract Merrill from their planned departure, several senior members of GCIAS, including Emily Fletcher and James Kaufman, approached Merrill about entering its retirement program over the next 18 months.

57.    Merrill's compensation leadership team spent valuable time and resources over many months, designing special processes that would enable Merrill to accommodate these senior leaders' request to enter its retirement program. All the while, Fletcher and Kaufman were actively plotting for nearly 170 GCIAS employees (the inheriting advisors) to leave.

58.    These are the actions of which Merrill is aware or believes to be true as of this date.  However, Merrill anticipates that discovery will yield even greater evidence of Defendants' tortious conduct.

59.    Merrill therefore brings this action to stop Defendants' harmful conduct and remedy the serious and irreparable harms they have caused Merrill.

### D. The Individual Defendants' Agreements with Merrill Prohibited the Very Conduct in Which They Engaged.

60.    As a condition of their employment with Merrill, the Individual Defendants executed a variety of agreements and attestations confirming the confidentiality of Merrill's customer information and proprietary data, prohibiting its use or disclosure to third parties, prohibiting the solicitation of Merrill customers and employees, and agreeing to return all confidential and proprietary information to Merrill upon the termination of their employment.

61.    For example, at the commencement of their employment, Bjerke (in 1997), Higginbotham (in 1999), Kaufman (in 1998), and Neumeyer (in 2000) each signed a Financial Consultant Employment Agreement and Restrictive Covenants (EARC, attached as Ex. A), in which these Individual Defendants acknowledged that all client records are trade secrets belonging to Merrill and they were obligated to safeguard customer privacy and maintain the confidentiality of Merrill's information (emphasis in original):

> 1.    All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on

behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

62.    In the EARC, Bjerke, Higginbotham, Kaufman, and Neumeyer further acknowledged that they owed Merrill a duty of loyalty and a duty to act in good faith during their employment, and they agreed not to solicit customers for one year following their termination of employment. Ex. A at ¶¶2-3.

63.    Additionally, Fletcher, who was designated as the GCIAS "COO," signed a Confidentiality Agreement dated April 1, 2011.  See Ex. B.  Pursuant to the Confidentiality Agreement, Fletcher agreed to preserve Merrill's Confidential Information and Trade Secrets:

I acknowledge that Bank of America, National Association, its parents, subsidiaries affiliated entities (including Merrill Lynch, Pierce, Fenner & Smith Incorporated) and its Global Wealth & Investment Management business (together "the Company"), conduct a broad and evolving range of business operations that regularly utilize and rely on confidential information which is

proprietary to its businesses. I also understand that in an effort to provide competitive business services and create and preserve customer goodwill, the Company has devoted considerable financial and personnel resources to safeguarding the confidentiality of this information, and requires its employees to acknowledge their personal responsibilities and fiduciary duties in this regard. Therefore, in consideration of my employment with the Company, and in consideration of the rights and benefits afforded to me in connection therewith, including but not limited to my compensation, I hereby agree as follows:

**Preservation of Confidential Information and Trade Secrets**
I specifically understand and agree that all documents (including, without limitation, all files, reports, manuals, books and records, account information, customer names, addresses, account numbers, planners, holding book or customer book pages, financial statements, or any models, spreadsheets, computer programs, databases or customer lists created or modified for the Company's business purposes by an employee of the Company) related to the businesses of the Company and in my possession or to which I may have access as a result of my employment with the Company, (whether in written or electronic form), are and will remain the sole and exclusive property of the Company. I will not reproduce or appropriate for my own use, or for the use of others, any property of the Company. I further agree that upon my termination from the Company (for any reason whatsoever) and/or at any other time as the Company shall request, I will deliver to the custody of whatever person the Company shall designate, all originals or copies of such documents or other tangible Confidential Information and Trade Secrets in my possession, including any electronic files which have come into my possession as a result of my employment with the Company, whether contained on Company owned electronic devices or equipment, or devices or equipment owned by me personally, and the Company has the right to inspect and remove from such devices or equipment any Company owned information.

64.    In the Confidentiality Agreement, Fletcher further agreed to preserve

Merrill's relationships with its customers and employees:

2

To the fullest extent permitted by law, during my employment with the Company, and for twelve months after my termination (for whatever reason) I agree I will not directly or indirectly, on behalf of myself or any other person or entity, alone or in concert with or on behalf of others, solicit, encourage, influence, recruit or induce or attempt to solicit, encourage, influence, recruit or induce any employee of the Company to cease working for the Company, or otherwise interfere with the employment of any person employed by the Company to leave the employ of the Company, or otherwise interfere with the relationship between the Company and any of its employees.

I similarly agree that during my employment with the Company and for twelve months after my termination (for whatever reason) I will not directly or indirectly, alone or in concert with or on behalf of others, solicit, encourage, influence, invite or induce or attempt to solicit, encourage, influence, invite or induce any client or customer whom I served during my employment with the Company or whose name became known to me as a result of my access to the Company's Confidential Information and Trade Secrets for the purpose of: obtaining that client or customer's business for myself or any other person or entity, causing such client or customer to discontinue doing business with the Company, or otherwise interfering with the relationship between such clients or customers and the Company. I understand that the Company retains the sole discretion to waive or modify these restrictions, and may do so if in writing and signed by Senior Management of the Company.

<u>"Solicit, encourage, influence, or induce" means that I will not, whether directly or indirectly, contact or communicate in any way whatsoever, for the express or implicit purpose of requesting a client, customer, or employee to cease doing business with or remaining employed by the Company, or to begin doing business with or taking employment with a competitive entity.</u>

65.    In 2018, two of the original GCIAS senior leaders, James Wallace and Deborah Howard, signed retirement agreements with Merrill. In connection with Wallace and Howard's retirement, Bjerke, Crowell, Fife, Fletcher, Hartnett,

Higginbotham, Kaufman, Neumeyer, Prediletto, Sacco, Sontag, and White executed an Agreement for Receiving GCIAS FAs ("Receiving FA Agreement"), which confirms that Confidential Information "represents a valuable and unique asset of Merrill Lynch and constitutes a trade secret and property belonging exclusively to Merrill Lynch." Ex. C at ¶3. Each of the Individual Defendants agreed "not to disclose Customer Information to any third party, including competitors of the Company, at any time, except for the purposes of conducting business on behalf of Merrill Lynch." Id.

66.    Pursuant to the Receiving FA Agreement, the Individual Defendants further agreed that, in exchange for the opportunity to continue servicing and receiving compensation from the account pools previously captured by Wallace and Howard, they would not "directly or indirectly solicit, or initiate contact or communication with the 'Eligible Households'" for one year following termination of employment.    "Eligible Households" was defined to include (i) all clients/accounts serviced by Wallace/Howard; (ii) any clients/accounts householded with the clients serviced by Wallace or Howard, and (iii) any other client of the Company whose assets/accounts were serviced by Wallace or Howard. Ex. C at ¶2.

67.    Despite the clear, unambiguous language in these agreements, the Individual Defendants misappropriated Merrill's information, repurposed it to

benefit OpenArc, Dynasty, and Schwab, and solicited Merrill's employees, all in a coordinated effort to lift out the GCIAS business and solicit Merrill's customers.

### E. Dynasty Violated Its Agreement to Adhere in Good Faith to the Protocol for Broker Recruiting.

68.    In 2004, Merrill and two other firms entered into a contract known as the Protocol for Broker Recruiting ("Protocol").

69.    The Protocol was open to any company in the industry who wanted to sign on, and it was designed to develop a permissible set of rules and procedures governing the orderly transition of registered representatives from one signatory firm to another.

70.    By signing onto the Protocol, signatory firms agree to implement the Protocol and abide by these transition rules in good faith.

71.    Effective May 14, 2010, Dynasty signed on to the Protocol.

72.    Although other firms subsequently withdrew from the Protocol, both Merrill and Dynasty are still current signatories.

73.    The Protocol rules contemplate that certain customer information can be exchanged, but only ***after*** a registered representative changes firms, and ***only if*** the registered representative is moving between two Protocol signatory firms.

74.    Despite its agreement to adhere to the Protocol in good faith, Dynasty, upon information and belief, actively encouraged the Individual Defendants to take

Merrill's customer information and provide it to Dynasty before they resigned from Merrill.

75.    Upon information and belief, once Dynasty received Merrill's customer information, Dynasty shared it with Schwab, which is not a signatory to the Protocol and has no right to access Merrill's Confidential Information.

76.    To make matters worse, Dynasty _**knew**_ that the Individual Defendants were not planning to move from Merrill to Dynasty.  Instead, they were forming their own RIA, OpenArc, and would be moving from Merrill to OpenArc.

77.    Under the circumstances, Dynasty violated the Protocol.

## CAUSES OF ACTION

## COUNT I

**(Violations Of The Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1))**

78.    Merrill alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.    The Defend Trade Secrets Act ("DTSA") prohibits the misappropriation of trade secrets related to "service[s] used in, or intended for use in" interstate commerce. 18 U.S.C. § 1836(b)(1).

80.    A trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" that derive "independent economic value" from "not being generally known" or "readily

ascertainable through proper means by another person" and that its owner "has taken reasonable measures" to keep secret. Id. § 1839(3).

81.    Merrill's proprietary compilations of client information, including but not limited to client account names, client account numbers, contact information for institutional clients, third party money manager identities and contacts, number and identity of plan participants, non-participant identities, participant and non-participant contact information, downstream account and other lead opportunities, proprietary investment strategies, customer risk tolerances, safe harbor information, product offerings, total assets under management invested in each employee-sponsored plans, individual participant account balances, pricing, plan participant eligibility criteria, and customer financial information, all constitute trade secrets under the DTSA.

82.    Merrill's information is not generally known or readily ascertainable by proper means.

83.    Merrill derives substantial value from its proprietary client account information.

84.    By developing and using that information, Merrill has generated substantial revenues through its financial services and developed goodwill with clients.

85.    Merrill reasonably protects its trade secrets by requiring all employees to abide by confidentiality obligations under employment agreements as a condition of employment and restricting internal access to its trade secrets through security software, dual access verifications, password and username protections, and other technologies.

86.    Merrill's trade secrets are further related to services offered and used in interstate commerce. Merrill's trade secrets were and are developed by Merrill in furtherance of its GCIAS business and are used to provide client and financial services across the United States. See id. § 1836.

87.    The Individual Defendants gained access to Merrill's trade secrets while employed with GCIAS, including but not limited to compilations of client account information, client account numbers, client lists, client and prospect financial information, and other private client-related information, such as those described above.

88.    Defendants intentionally and willfully misappropriated Merrill's confidential information and trade secrets through improper means.  For example, upon information and belief, GCIAS senior leaders, including Fletcher, Kaufman, and Higginbotham, shared with Dynasty, OpenArc, and Schwab sensitive GCIAS business compilations stored on a local, limited access hard drive on Merrill's

systems, for the purpose of gauging Dynasty's interest in partnering with OpenArc and securing a financial offer package.

89. Upon information and belief, the GCIAS senior leaders also accessed and repurposed trade secret information on the Merrill system to create "presentations" given to the other Merrill financial advisors and support personnel working with GCIAS, to convince those Merrill employees to jump ship to the competition.

90. In connection with their Merrill employment, the Individual Defendants signed agreements and acknowledged employment policies pursuant to which they each agreed not to disclose or use Merrill's trade secrets to advance their personal interests or any third-party's interests.

91. The Individual Defendants further knew, pursuant to the agreements and policy acknowledgements signed during the course of their many years of employment, that Merrill's customer-related information constitutes trade secrets and proprietary information, not to be used for any purpose other than in the ordinary course of performing duties on behalf of Merrill.

92. The Individual Defendants have nevertheless disclosed and misused Merrill's trade secrets to further their and OpenArc's interests and harm Merrill.

93. Further, Dynasty, OpenArc, and Schwab—all of whom knew or should have known about the Individual Defendants' confidentiality and other post-

27

employment obligations—wrongly induced the Individual Defendants to disclose and misuse Merrill's confidential, trade secret, and proprietary information in violation of their legal obligations, to advance the business interests of the Corporate Defendants and harm Merrill.

94.    Defendants have misused Merrill's trade secrets to unlawfully compete against Merrill.

95.    Defendants' violations of the DTSA have harmed and continue to harm Merrill.

96.    Defendants have caused Merrill to expend substantial resources to combat their violations of the DTSA.

97.    Defendants have also caused Merrill to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing Merrill's client relationships, misappropriating Merrill's trade secrets, and harming Merrill's reputation and goodwill with its clients and in the marketplace.

98.    Defendants have further deprived Merrill of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

99.    Merrill is entitled to damages and restitution from all Defendants, declaratory and injunctive relief, exemplary damages, attorney's fees and costs, as well as other available remedies, as set forth in its Prayer for Relief. See 18 U.S.C. § 1836(b)(3)(B)–(D).

## COUNT II

**(Misappropriation of Confidential Information and Trade Secrets/
Violation of O.C.G.A. §§ 10-1-761, et seq.)**

100. Merrill alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 99 of this Verified Complaint as if fully set forth herein.

101. As described above, the Defendants collaborated with one another to misappropriate Merrill's confidential customer information, proprietary business information, and other trade secrets in violation of the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. §§ 10-1-761 et seq.

102. At all times material, each of the Defendants knew, or should have known, that Merrill's confidential and proprietary information deserves trade secret protection under GTSA, inasmuch as:

(a) Merrill invested substantial resources to create, develop, compile, and maintain this information;

(b) The information is not known outside of Merrill;

(c) Merrill takes significant precautions to safeguard the confidentiality of this information, including but not limited to requiring its employees to execute confidentiality agreements and other restrictive covenants;

(d) The information cannot be replicated, compiled, or recreated by a competitor without substantial time, effort, and expense and is not generally attainable by proper means by the public or any other person who can derive commercial or economic value from its disclosure or use; and

(e) Merrill's confidential and trade secret information is of significant independent economic value to Merrill and is extremely important in the conduct of its GCIAS business, and would be extremely valuable to Merrill's competitors, such as the Corporate Defendants.

103.    Merrill allowed access to its confidential information to the Individual Defendants while they were in positions of trust and confidence and under circumstances that make it inequitable and unjust for them to have misappropriated the materials and to use it for their own benefit.

104.    Merrill reasonably protects its trade secrets by requiring all employees to enter employment agreements that include confidentiality obligations as a condition of employment and restricting internal access to its trade secrets through security software, passwords and usernames, and other technologies.

105.    Defendants electronically secured Merrill's confidential, trade secret, and proprietary information through improper means sufficient to constitute misappropriation under O.C.G.A. § 10-1-761(2).

106.    Defendants are liable for the wrongful conversion of Merrill's confidential, trade secret, and proprietary materials.

107.    As a direct and proximate result of Defendants' wrongdoing, Merrill is suffering immediate and irreparable harm.

108.    Conduct in violation of the GTSA may be enjoined under O.C.G.A. § 10-1-762.

109.   Because of the willful nature of the violation, Merrill is also entitled to exemplary damages as allowed by O.C.G.A. § 10-1-763.

110.   Accordingly, Merrill requests injunctive relief and ordinary and exemplary damages, as well as all other available remedies, for the Defendants' violation of GTSA, as set forth in Merrill's Prayer for Relief.

## COUNT III

### (Tortious Interference with Merrill's Business Relations with Customers and Prospects)

111.   Merrill alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 110 of this Verified Complaint as if fully set forth herein.

112.   Merrill has significant and vital business relationships and expectancies with customers and prospective customers across the United States and throughout the world.

113.   The Individual Defendants, as being previously employed by Merrill, have knowledge of those relationships and expectancies of Merrill.

114.   The business relations and expectancies include but are not limited to the clients that the Individual Defendants previously serviced and worked with while employed at Merrill.

115.   Moreover, because the Individual Defendants founded OpenArc and colluded with Dynasty and Schwab, those other entities now have specific knowledge of Merrill's business relations with its clients.

31

116.   Defendants have maliciously and intentionally acted to prevent Merrill from developing and maintaining its business relations with its clients and prospects.

117.   Defendants have willfully and intentionally solicited Merrill's clients and prospects, working to induce and pressure them to leave (or not to engage with) Merrill and instead become clients of OpenArc.  Defendants' actions were taken through unlawful means by intentionally and willfully misappropriating Merrill's confidential, trade secret, and proprietary materials and engaging in unlawful and prohibited practices.

118.   By doing so, Defendants have prevented Merrill from developing and pursuing business relationships with its own legacy clients and the prospective clients Merrill has developed over the years.

119.   Defendants' conduct has harmed and continues to harm Merrill. Merrill has had to expend more resources and incurred costs to maintain its business relationships with clients and prospective clients, all of which has resulted from Defendants' unlawful conduct.

120.   Defendants have also caused Merrill to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing Merrill's client relationships, misappropriating Merrill's trade secrets, and harming Merrill's reputation and goodwill.

121.   Defendants have further deprived Merrill of the value of its substantial investments in its trade secrets, business relationships, and goodwill.

122.   Merrill is entitled to and seeks damages from Defendants, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT IV

**(Tortious Interference with Merrill's Contractual Relations with Employees)**

123.   Merrill alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 122 of this Verified Complaint as if fully set forth herein.

124.   Merrill had an employer-employee relationship with each of the Individual Defendants and the other Merrill employees who worked with GCIAS.

125.   The Individual Defendants maliciously and intentionally acted to threaten Merrill's employees, coerce them into signing contracts that were contrary to their employer's interests, and incentivize them to violate their duties of loyalty.

126.   The Individual Defendants willfully and intentionally solicited Merrill's employees by engaging in these unlawful and prohibited practices, with the endorsement and active support of the Corporate Defendants.

127.   By doing so, Defendants have, collectively, prevented Merrill from maintaining its employment relationships.

128.   Defendants' conduct has harmed and continues to harm Merrill.

129.   Merrill is entitled to, and seeks damages from Defendants, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT V

### (Breach of Duty of Loyalty)

130.   Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 129 of this Verified Complaint as if fully set forth herein.

131.   Under Georgia law, employees, including at-will employees, owe a duty of loyalty to their employers and cannot, for instance, solicit customers or directly compete for business while still employed. *Tom's Amusement Co. v. Total Vending Servs*., 243 Ga. App. 294, 295-96, 533 S.E.2d 413, 416-17 (2000).

132.   The duty of loyalty requires that employees not compete with their employer during the period of employment.

133.   The Individual Defendants and Merrill maintained valid employment relationships, pursuant to which the Individual Defendants were at-will employees of Merrill.

134.   Under that relationship, the Individual Defendants owed Merrill a duty of loyalty.

135.   Each of the Individual Defendants breached their duty of loyalty to Merrill by, among other misconduct, competing against Merrill while employed at the firm; improperly sharing Merrill's confidential, trade secret, and proprietary

information; soliciting other Merrill employees; and taking other actions intentionally designed to divert existing business and future business opportunities away from Merrill.

136.    In sum, while still employed at Merrill, the Individual Defendants acted to maximize dysfunction, create fear and confusion, and leave behind a wake of disrupted business operations that would make it as difficult as possible for GCIAS to continue to compete in the institutional consulting and retirement space after the Individual Defendants' departure.

137.    Specifically, while still employed at Merrill, Fletcher developed and formed a competing entity, OpenArc, commissioned and signed a non-disclosure agreement with other Merrill employees, scouted new office locations, and helped to coordinate an office buildout for a competing endeavor.

138.    While still employed at Merrill, Kaufman hosted group meetings at the Merrill office and commissioned the creation of non-disclosure agreements, which he presented to Merrill employees, under threat of repercussions if they refused to sign or disclosed the Individual Defendants' plans, and promised significant rewards if they went along with betraying Merrill.

139.    White and Hartnett misappropriated and misused Merrill's trade secrets to develop presentations to the other GCIAS employees, solicit them, and intentionally interfere with Merrill's employee relationships.

140.    The Individual Defendants further planned to unlawfully use Merrill's trade secret information to compete with Merrill, solicit its customers, and impede Merrill's ability to continue supporting its institutional consulting and retirement business.

141.    The Individual Defendants' breaches have harmed and continue to harm Merrill.

142.    The Individual Defendants have deprived Merrill of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

143.    The Individual Defendants have also caused Merrill to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing Merrill's client relationships, misappropriating Merrill's trade secrets, and harming Merrill's reputation and goodwill with clients.

144.    Merrill is entitled to, and seeks, damages, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT VI
### (Breach of Contract)

145.    Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 144 of this Verified Complaint as if fully set forth herein.

146.    As Merrill employees with GCIAS, Individual Defendants had access and frequent exposure to sensitive, proprietary, and trade secret information

regarding the GCIAS business, including customers, their assets, revenue, profit generation, investments, and investment goals.

147.   To that end, Individual Defendants were required to and did sign various agreements with Merrill, including the EARC, the Receiving FA Agreement, and the Confidentiality Agreement.

148.   Upon information and belief, Mack, Higginbotham, Bjerke, Neumeyer, and Kaufman breached their obligations under the EARC.

149.   Upon information and belief, Fletcher breached her obligations under the Confidentiality Agreement.

150.   Upon information and belief, each of the Individual Defendants who signed the Receiving FA Agreement breached their obligations thereunder.

151.   Upon information and belief, the Individual Defendants disclosed and misused Merrill's proprietary and confidential information, including its trade secrets related to Merrill's client accounts and related financial information, to advance the interests of OpenArc, Dynasty, Schwab, and themselves.

152.   Upon information and belief, the Individual Defendants solicited Merrill employees and interfered with Merrill's business relations with customers and employees.

153.   Georgia law further implies in every contract an obligation for each party to perform in good faith to fulfill the conditions of the contract. *Alpha Rho*

*Corp. of Delta Delta Delta v. Mathis Apts.*, Inc., 364 Ga. App. 28, 33, 873 S.E.2d 717, 721 (2022).

154.   Upon information and belief, the Individual Defendants intentionally breached their agreements in bad faith to further their personal interests and harm Merrill.

155.   Rather than comply with their contractual obligations to safeguard Merrill's information and refrain from soliciting Merrill's clients and employees, the Individual Defendants acted in bad faith to prioritize their own (and OpenArc's) financial interests ahead of Merrill's interests, without any basis or privilege whatsoever.

156.   Upon information and belief, the Individual Defendants disclosed and used Merrill's confidential, trade secret, and proprietary information to unlawfully compete against Merrill.

157.   The Individual Defendants' contractual breaches have harmed and continue to harm Merrill.

158.   The Individual Defendants caused Merrill to suffer continuing and irreparable harm, including by unlawfully interfering with and jeopardizing Merrill's client relationships, misappropriating Merrill's trade secrets, and harming Merrill's reputation and goodwill with clients.

159.    The Individual Defendants further deprived Merrill of the value of its substantial investments in its trade secrets as well as relationships and goodwill with its clients.

160.    Merrill is entitled to, and seeks, damages, declaratory and injunctive relief, as well as all other available remedies, as set forth in its Prayer for Relief.

## COUNT VII
### (Unfair Competition/Raid)

161.    Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 160 of this Verified Complaint as if fully set forth herein.

162.    The Corporate Defendants' solicitation of the Individual Defendants and members of the support staff from GCIAS, and its diversion of Merrill customers and goodwill, assets under management, revenues, and commissions generated by GCIAS, was a deliberate attempt to damage Merrill and transfer a substantial portion of its production and assets to themselves.  This conduct violates industry standards and common law, which prohibit unjust, inequitable, and unfair competition.

163.    The Corporate Defendants accomplished the raid through the use of large monetary incentives offered to the Individual Respondents and support staff.

164.    As a result of the Corporate Defendants' unlawful predation, Merrill has suffered great harm and loss to its GCIAS group, including severe irreparable economic damages, the loss of key employees, customers, business, revenue, profits, goodwill, and reputation.

165.   The Corporate Defendants knew that their raid of GCIAS was unfair and violated state law and industry standards.  FINRA, NASD, and NYSE arbitration panels have repeatedly sanctioned securities firms for similar raiding conduct.

166.   Rather than invest the years, effort, money, and other resources to develop a successful GCIAS group, the Corporate Defendants instead took a shortcut by raiding Merrill's GCIAS group; its fully-trained, developed, experienced, and seasoned employees; and its investment in and establishment of an institutional consulting and retirement business.  The Corporate Defendants should not be permitted to unjustly harvest and enjoy the profits from the substantial resources that Merrill has invested in this line of business.

167.   Upon information and belief, Individual Defendants, acting in concert with, at the direction of, and/or for the benefit of, Schwab, OpenArc, and Dynasty, and using Merrill's confidential and proprietary information and trade secrets, directly, intentionally, and improperly conspired to solicit and induce Merrill's employees to resign from Merrill and accept employment with OpenArc, a newly formed registered investment firm created to directly compete with Merrill's GCIAS line of business.

168.   At all times material and by virtue of their crucial roles with Merrill, Individual Defendants knew or should have known that this unfair and unlawful

practice would result in significant irreparable injury to Merrill. Likewise, Schwab and Dynasty were aware of the Individual Defendants' legal obligations to Merrill at the time they engaged in the complained of conduct.

169.    Upon information and belief, all of the Defendants took these steps with the intention of, and for the purpose of, *inter alia*, (1) raiding and causing harm to Merrill; and (2) using/misappropriating/converting Merrill's confidential and proprietary information and trade secrets.

170.    The Defendants' foregoing conduct constitutes unfair methods of competition.

171.    The Defendants' above-described actions are the direct and proximate cause of immediate and irreparable harm to Merrill.

172.    Merrill is entitled to and seeks damages, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies for the Defendants' Unfair Competition and Raiding, as set forth in its Prayer for Relief.

## COUNT VIII
## (Conspiracy)

173.    Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 172 of this Verified Complaint as if fully set forth herein.

174.    Defendants agreed and conspired to engage in unlawful trade practices and unfair competition, all to the detriment of Merrill, and to eliminate lawful

competition. The aforementioned conspiracy was furthered by Defendants' unlawful conduct as described herein.

175. As a direct and proximate result of the foregoing, Merrill has suffered, and will continue to suffer, great economic injury and loss, all to the direct gain of Defendants.

176. As a direct and proximate result of the Defendants' wrongdoing, Merrill is suffering immediate and irreparable harm.

177. Merrill is entitled to and seeks damages, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies for the Defendants' Conspiracy, as set forth in its Prayer for Relief.

## COUNT IX
### (Breach of the Protocol)

178. Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 177 of this Verified Complaint as if fully set forth herein.

179. Individual Defendants may attempt to invoke the protections of the Protocol by contending that Merrill and Dynasty (and possibly OpenArc) are Protocol signatory firms, and/or that they themselves are the intended third-party beneficiaries of this agreement.

180. However, by virtue of their pre-resignation conduct, in misappropriating, misusing, and sharing confidential, trade secret, and proprietary information in violation of their legal obligations, soliciting other Merrill employees,

diverting business opportunities, soliciting clients, and otherwise breaching their duties of loyalty to Merrill, the Individual Defendants forfeited their eligibility to invoke the safe harbor protections of the Protocol.

181.    Additionally, since the Individual Defendants were not moving from Merrill to Dynasty, and Schwab is not a signatory to the Protocol, the Protocol does not protect the Individual Defendants' disclosure of confidential, trade secret, and proprietary information to the Corporate Defendants.

182.    Furthermore, the types and extent of information misappropriated and shared by the Individual Defendants fall outside the protections of the Protocol.

183.    Individual Defendants who were not eligible to invoke the protections of the Protocol took customer information in violation of the Protocol.

184.    Individual Defendants took customer information that they were not permitted to take because such customers were excluded from the Protocol.

185.    Accordingly, by engaging in the pre-resignation misconduct described above, prematurely sharing information, sharing information with Dynasty, OpenArc, and Schwab, retaining and sharing more information than the Protocol permits, the invocation of the Protocol by ineligible employees, and the taking of information pertaining to impermissible customers, the Individual Defendants violated the Protocol, and were not permitted to take any customer information or solicit any Merrill clients.

186.    Moreover, by encouraging and assisting the Individual Defendants to violate the Protocol, Dynasty (and possibly OpenArc) violated its agreement to abide by the Protocol.

187.    As a direct and proximate result of the foregoing Protocol violations, Merrill has suffered, and will continue to suffer, great economic injury and loss, all to the direct gain of the Defendants.

188.    As a direct and proximate result of the Defendants' wrongdoing, Merrill is suffering immediate and irreparable harm.

189.    Merrill is entitled to, and seeks, damages, declaratory and injunctive relief, attorney's fees and costs, as well as all other available remedies for the Defendants' Protocol Violations, as set forth in its Prayer for Relief.

## COUNT X
### (Declaratory Judgment Pursuant To 28 U.S.C. § 2201)

190.    Merrill re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 189 of this Verified Complaint as if fully set forth herein.

191.    An actual and justiciable controversy exists concerning whether Defendants' conduct amounts to intentional and willful misappropriation of Merrill's trade secrets in violation of the DTSA and GTSA, and tortious interference with Merrill's business relationships with its clients.

192.    An actual and justiciable controversy also exists concerning whether the Individual Defendants have violated the confidentiality, non-solicitation, and

implied obligations of their respective agreements, as well as their duties of loyalty to Merrill.

193.  Merrill alleges the Defendants have conspired with one another, engaged in intentional and willful misappropriation of Merrill's confidential and proprietary information and trade secrets, tortiously interfered with Merrill's business relations and contractual relations, as well as raiding and other unfair and deceptive trade practices against Merrill, and that the Individual Defendants have breached their express and implied obligations under their Agreements. The Defendants will dispute Merrill's allegations.

194.  Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Merrill prays that this Court enter judgment against the Defendants, granting the following relief:

1.  Declarations that:

   (a) Defendants violated the DTSA by intentionally and willfully misappropriating Merrill's trade secrets to solicit Merrill's GCIAS business;

   (b) Defendants violated the GTSA by intentionally and willfully misappropriating Merrill's confidential information and trade secrets to solicit Merrill's employees and clients;

   (c) Defendants tortiously interfered with Merrill's client and business relationships;

(d) Individual Defendants breached their duties of loyalty to Merrill while still employed by Merrill, by conspiring with Schwab and Dynasty, competing against Merrill through OpenArc, soliciting other Merrill employees at group meetings held at Kaufmann's home and in the Merrill Peachtree office, presenting those employees with unapproved non-disclosure agreements, coercing and threatening other Merrill employees, and sharing Merrill's confidential information and trade secrets other than in the ordinary course of performing duties on behalf of Merrill;

(e) Individual Defendants breached the Agreement by disclosing and using Merrill's confidential information and trade secrets to advance their own interests and the interests of OpenArc, Dynasty, and Schwab, soliciting Merrill employees and diverting Merrill's GCIAS business and clients to their new RIA; and

(f) Individual Defendants breached their implied covenants of good faith and fair dealing owed to Merrill by acting in bad faith to deprive Merrill of the benefits of its bargain to protect its confidential information and trade secrets and prevent the poaching of employees, clients, and the GCIAS business.

2.    An injunction:

(a) Enjoining Defendants from disclosing and using any of Merrill's confidential and proprietary information and trade secrets;

(b) Enjoining all Defendants and anyone acting in concert with them from intentionally and maliciously interfering with Merrill's business relationships with its clients and contractual relationships with its employees; and

(c) Enjoining each of the Individual Defendants from directly or indirectly soliciting or attempting to solicit any of Merrill's clients for one year post-employment.

3.    Damages in an amount to be proven at trial;

4.    Statutory damages, including multipliers and equitable enhancements, as permitted by law;

5.      Disgorgement by Defendants of all ill-gotten gains, as permitted by law;

6.      Punitive and exemplary damages in an amount to be proven at trial;

7.      Attorney's fees and costs, as permitted by law;

8.      Pre-judgment and post-judgment and other interest on all monetary damages, as permitted by law; and

9.      Any and all such further relief the Court deems just and proper.

Respectfully submitted, this 23rd day of September, 2025.

/s/ Tala Amirfazli
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com
*Counsel for Plaintiff Merrill Lynch,*
*Pierce, Fenner & Smith Incorporated*

**BURR & FORMAN LLP**
1075 Peachtree Street NE, Suite 3000
Atlanta, Georgia  30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## **DECLARATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements contained in the Verified Complaint related to Merrill are true and correct to the best of my knowledge and belief.

Michael Nies, Market Executive
Merrill Lynch, Pierce, Fenner & Smith Incorporated