# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **MERRILL LYNCH, PIERCE, FENNER &** | ) | |
| **SMITH INCORPORATED** | ) | |
| | ) | **Civil Action File** |
| **Plaintiff,** | ) | **No. 1:25-cv-05437-VMC** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ERIK BJERKE, JEFFREY CROWELL,** | ) | |
| **CHAD PIGG FIFE, EMILY FLETCHER,** | ) | |
| **BRITTANY HARTNETT, KEVIN** | ) | |
| **HIGGINBOTHAM, JAMES KAUFMAN,** | ) | |
| **JEFFREY NEUMEYER, STEVEN** | ) | |
| **PREDILETTO, JOSEPH SACCO,** | ) | |
| **MICHAEL SONTAG, ELIZABETH** | ) | |
| **WHITE, OPENARC CORPORATE** | ) | |
| **ADVISORY, LLC, DYNASTY** | ) | |
| **FINANCIAL PARTNERS, LLC and** | ) | |
| **CHARLES SCHWAB & CO., INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

COMES NOW Plaintiff, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") and hereby submits this Memorandum of Law in support of its Motion for Temporary Restraining Order and Preliminary Injunction against former Merrill Financial Advisors Erik Bjerke, Jeffrey Crowell, Chad Pigg Fife, Emily Fletcher,

Brittney Hartnett, Kevin Higginbotham, James Kaufman, Jeffrey Neumeyer, Steven Prediletto, Joseph Sacco, Michael Sontag, and Elizabeth White (together, the "Individual Defendants"), and their new employer, OpenArc Corporate Advisory, LLC ("OpenArc"), Dynasty Financial Partners, LLC ("Dynasty"), and Charles Schwab & Co., Inc. ("Schwab") (together, the "Corporate Defendants") (collectively "Defendants"), respectfully showing the Court as follows:

## I.    <u>INTRODUCTION AND STATEMENT OF FACTS</u>

Merrill brings this action to prevent the culmination of a pre-meditated raid of its Global Corporate and Institutional Advisory Services ("GCIAS") business by its former employees and their corporate co-conspirators. <u>See</u> Verified Complaint at ¶ 1. GCIAS is comprised of a group of 90 financial advisors and 80 operational professionals. <u>See</u> Affidavit of Michael Nies ("Nies Affidavit") at ¶ 17. Upon information and belief, the Individual Defendants and the Corporate Defendants have been collaborating to divert the GCIAS business from Merrill and open a Dynasty and Schwab-affiliated Registered Investment Advisor ("RIA"), called OpenArc. <u>See</u> Nies Affidavit at ¶¶ 28-29. While still employed by Merrill, the Individual Defendants conspired among themselves and with the Corporate Defendants to make sure that their departure to Dynasty and OpenArc would be joint, simultaneous, and disruptive. <u>See</u> Nies Affidavit at ¶¶ 28-30. For example, Individual Defendants solicited other Merrill employees at group meetings held at

Kaufman's home and in the Merrill Peachtree office. <u>See</u> Nies Affidavit at ¶ 30. They presented those employees with unapproved non-disclosure agreements in violation of their duty of loyalty to Merrill, discussed ways to disrupt Merrill's ongoing business functions in the office following their departure, and shared confidential and proprietary information concerning Merrill employees and Merrill customers with the Corporate Defendants. <u>See id.</u> The Individual Defendants knew that their coordinated departure would negatively impact Merrill's ongoing business functions in the office following their departure. <u>See</u> Verified Complaint at ¶¶ 54-55.

A.      <u>The Origin of GCIAS</u>

Merrill is the investment and wealth management division of Bank of America (collectively, Merrill and its Bank of America affiliates are the "Company"). <u>See</u> Verified Complaint at ¶ 29. Merrill employs more than 17,000 employees, who service the comprehensive needs of high and ultra-high net worth individuals, families, and businesses in more than 500 offices across 100 U.S. markets. <u>See id.</u> As part of the wealth management services that Merrill provides to its clients, Merrill maintains several "specialty" practice groups, the largest of which is GCIAS. <u>See</u> Verified Complaint at ¶ 30. Headed by a group of senior members, including Individual Defendants, GCIAS is comprised of 90 financial advisors who provide Merrill-affiliated products and services to certain corporations and certain

3

individuals across the globe. <u>See</u> Nies Affidavit at ¶¶ 17-18. Including support staff, Merrill employs approximately 170 people in GCIAS. <u>See</u> Nies Affidavit at ¶ 17. GCIAS services Merrill clients that include U.S. and international corporations, ultra-high net worth and mass affluent individuals and families, and institutions that range in size from small businesses to large, multi-national conglomerates. <u>See</u> Nies Affidavit at ¶ 18. Working with GCIAS creates a unique opportunity for financial advisors to service distinct types of clients: (a) the 401(k), RSU, stock benefit, or other retirement or equity plans sponsored by corporations and institutions (the "Plans"); and (b) the individual executives and employees who participate in retirement, benefit, or other plans sponsored by a corporate client of Merrill (the "downstream accounts"). <u>See</u> Nies Affidavit at ¶ 19.

The financial advisors with GCIAS derive significant compensation from the opportunity to convert Plan participants into downstream accounts. <u>See</u> Nies Affidavit at ¶ 20. Notably, unlike many financial advisors at Merrill, those with GCIAS are *given existing* client relationships to service and expand; they are not required or expected to source the clients themselves. <u>See</u> Nies Affidavit at ¶ 21. The Individual Defendants typically did not prospect new clients. Instead, they generated six- and seven-figure incomes from the downstream business derived from institutional clients already working with Merrill and internal referrals of potential clients from other segments of the Company. <u>See</u> Nies Affidavit at ¶ 22.

**B.**    **The Individual Defendants Received Access to Confidential and Proprietary Information, Which They Promised to Safeguard.**

During their training and employment with Merrill, financial advisors and operational professionals with GCIAS, and firm-wide, receive access to substantial amounts of confidential and proprietary information. See Nies Affidavit at ¶ 24. This information includes compiled client information, client lists, client account names and numbers, investment strategies and objectives, risk tolerances, current investments, and past revenues and rates of return, existing or forthcoming products and services, and strategic business plans. See Nies Affidavit at ¶ 25. Because of its unique role, Merrill also allows GCIAS access to certain non-public confidential data and information entrusted to Merrill by certain corporate and institutional clients, so that Merrill can manage the clients' compensation and stock benefit plans. See Nies Affidavit at ¶ 26. GCIAS, including the Individual Defendants, receives access to this information *in addition to* the confidential data that Merrill safeguards for all of its clients. See id. For obvious reasons, the confidential and proprietary information belonging both to Merrill and to its corporate and institutional clients is extremely valuable and not publicly available. See Nies Affidavit at ¶ 34.

Merrill also invests millions of dollars in compiling and developing its proprietary information to protect its market position as a highly regarded wealth management firm, spending substantial funds and time to develop its proprietary information—all of which has taken years to develop and build. See Verified

Complaint at ¶ 41. Given the significant value of and investments in developing its proprietary information, Merrill goes to great lengths to protect its confidential information, and it employs a number of security measures and checks and balances to safeguard customer privacy. <u>See</u> Nies Affidavit at ¶ 27. Specifically, Merrill financial advisors, as a condition of their employment, sign attestations and policy acknowledgements confirming the confidentiality of Merrill's customer information and proprietary data, prohibiting its use or disclosure to third parties, prohibiting the solicitation of Merrill customers and employees, and agreeing to return all confidential and proprietary information to Merrill upon the termination of their employment. <u>See</u> Verified Complaint at ¶ 60. Furthermore, Merrill financial advisors are granted access to information only pertaining to the clients[1] they service. <u>See</u> <u>id.</u>. Merrill locks down information systems, conducts regular surveys of outgoing data and documents, and prevents employees from inserting a flash drive or connecting an external hard drive to the system. <u>See</u> <u>id.</u> Merrill uses encryption protocols, complex password requirements, and double authentication requirements. <u>See</u> <u>id.</u>

---

[1] The terms "client" and "customer" are used interchangeably herein.

**C.**     **The Individual Defendants Conspired with Dynasty and Schwab to Move GCIAS Business to a Newly Formed Dynasty-Affiliated Registered Investment Advisor (OpenArc).**

Dissatisfied with earning millions of dollars annually at Merrill, and while still employed at the firm, the Individual Defendants began conspiring with Dynasty and its shareholder and main custodial partner, Schwab, and taking steps to form a competitor entity, OpenArc. See Verified Complaint at ¶ 45. The Individual Defendants' and Corporate Defendants' mutual goal was to solicit all 170 Merrill employees working with GCIAS to leave Merrill, followed by the thousands of Plans and downstream accounts serviced by GCIAS, effectively diverting all of these employees and clients from Merrill's Peachtree office to OpenArc—surreptitiously and without any advance warning to Merrill. See Nies Affidavit at ¶ 29. Upon information and belief, the Individual Defendants, with the help and support of the Corporate Defendants, took the following steps—all while still employed with Merrill:

      a.  founded and incorporated wealth management firm OpenArc (an RIA) to compete with Merrill;

      b.  identified, leased, and began the build out of new office space to house OpenArc, under Emily Fletcher's direction;

      c.  targeted senior members of GCIAS to move to OpenArc and Dynasty and then used those senior members to pitch the departure plan to junior members and support staff;

    d.  held meetings in Merrill offices and at the personal residences of James Kaufman and other GCIAS employees to coordinate their departure and persuade other employees to join the move;

    e.  required GCIAS employees to execute non-disclosure agreements regarding their "strategic discussions" with Kaufman, Bjerke, Fletcher, Crowell, Higginbotham and other GCIAS senior leaders, which prohibit them from discussing the planned move, in violation of their ongoing fiduciary duties and duties of loyalty owed to Merrill;

    f.  offered financial and equity incentives to junior members of GCIAS to sign non-disclosure agreements and commit to the move;

    g.  during meetings at GCIAS senior leaders' homes, James Kaufman, Elizabeth White, and Brittney Hartnett made Power Point pitch presentations to the captive audience, promising them equity in the business that the Defendants intended to divert from Merrill, increased compensation, and increased prestige;

    h.  distributed onboarding packets to GCIAS members;

    i.  used scare tactics to encourage employee departures, such as threats of lawsuits, and spread baseless rumors that Merrill would shut down GCIAS and terminate any junior level employee who remained behind; and

    j.  shared confidential and proprietary information concerning Merrill employees and Merrill customers with the Corporate Defendants.

<u>See</u> Nies Affidavit at ¶ 30.

While the Individual Defendants were engaged in the above conduct, and upon information and belief, Dynasty undertook some or all of the following tasks to facilitate a successful move from Merrill to OpenArc:

    a.  offered the Individual Defendants significant financial incentives to divert GCIAS business from Merrill to OpenArc and Dynasty;

b. encouraged the Individual Defendants to share confidential and proprietary Merrill employee information (e.g., compensation, performance, etc.) and customer information (contact information, assets under management, product preferences, etc.) to facilitate the transition;

c. provided guidance concerning business formation and firm structure, such as creating a legal entity, assisted in drafting operating agreements, investment advisor agreements, and determining ownership structure.[2]

d. initiated firm and representative registrations via the SEC Form ADV and the FINRA Form U4;

e. assisted with the identification of office space and the negotiation of leasing terms and office buildout; and

f. assisted with marketing, public relations, website development, digital and social media marketing, and on-site transition support.

See Verified Complaint at ¶ 48.

Exacerbating Merrill's concern that the Individual Defendants shared its trade secrets, proprietary information, and other confidential customer information with Dynasty, Dynasty's website states that it assists in reviewing and selecting asset custodians; providing asset mapping for client holdings and money movement needs; identifying third-party money managers, structured products, and credit and lending products; and "consulting on Protocol or non-Protocol client communication options." See Verified Complaint at ¶ 49. Dynasty could not perform any of those

---

[2] See Start An RIA | Dynasty Financial Partners | Wealth Management, available at https://dynastyfinancialpartners.com/advisors/start-ria/, last visited September 23, 2025.

functions without an in-depth review and comprehensive understanding of GCIAS and the thousands of corporate and downstream clients it services. <u>See</u> Verified Complaint at ¶ 50.

The team's move to Dynasty and OpenArc is reportedly important enough to Schwab that Schwab has promised to feed the Individual Defendants corporate equity plan clients and give them access to Schwab clients. <u>See</u> Nies Affidavit at ¶ 31. Upon information and belief, Dynasty and Schwab helped the Individual Defendants marshal approximately $90 million in capital funds for their move from GCIAS to OpenArc. <u>See</u> Nies Affidavit at ¶ 32. While still employed by Merrill, the Individual Defendants worked together and with the Corporate Defendants to make sure that their departure to Dynasty and OpenArc would be joint, simultaneous, and disruptive. <u>See</u> Verified Complaint at ¶ 54.

Moreover, to distract Merrill from their planned departure, several senior members of GCIAS, including Emily Fletcher and James Kaufman, approached Merrill about entering its retirement program over the next 18 months. <u>See</u> Verified Complaint at ¶ 56. Merrill's compensation leadership team spent valuable time and resources over many months, designing special processes that would enable Merrill to accommodate these senior leaders' request to enter its retirement program. <u>See</u> Verified Complaint at ¶ 57. All the while, Fletcher and Kaufman were actively plotting for nearly 170 GCIAS employees (the inheriting advisors) to leave. <u>See</u> <u>id.</u>

These are the actions of which Merrill is aware or believes to be true as of this date. See Verified Complaint at ¶ 58. However, Merrill anticipates that discovery will yield even greater evidence of Defendants' tortious conduct. See id. Merrill therefore brings this action to stop Defendants' harmful conduct and remedy the serious and irreparable harms they have caused Merrill. See Verified Complaint at ¶ 59. Defendants' conduct leaves Merrill with no choice but to seek the aid of this Court in preserving the status quo by protecting valuable trade secrets and enforcing its common law and contractual rights pending a hearing before FINRA.[3] See Verified Complaint at ¶ 4.

## II.    MERRILL IS ENTITLED TO INJUNCTIVE RELIEF

Merrill is entitled to the requested injunctive relief because: (1) Merrill has a substantial likelihood of prevailing on the merits of its claims; (2) Merrill will suffer irreparable injury if the relief is not granted; (3) Merrill's injury, both threatened and

---

[3] The parties who are members of the Financial Industry Regulatory Authority ("FINRA")—Merrill, the Individual Defendants, and Schwab—are required to arbitrate the merits of this dispute with FINRA pursuant to FINRA Rule 13200. Consequently, Merrill is also filing a Statement of Claim with FINRA. Although the merits will be resolved in arbitration, FINRA Rule 13804 provides that a party seeking temporary and preliminary injunctive relief in an otherwise arbitrable matter must do so in a court of competent jurisdiction. Once an injunction is issued by this Court, an expedited arbitration will be scheduled by FINRA within 15 days of entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, it will be assigned to standard-track processing, which could delay a hearing on the merits for a year or more. The temporary relief Merrill seeks is required to preserve the *status quo* and prevent irreparable harm pending arbitration.

incurred, outweighs the harm that the relief would inflict on Defendants; and (4) if granted, the injunction would not be adverse to the public interest. Fed. R. Civ. P. 65; see also Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034-35 (11th Cir. 2001); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988).

### A.    Merrill Is Likely to Succeed on the Merits.

Rather than seek to acquire Merrill's GCIAS business directly from Merrill for consideration (i.e., by lawful means), the Corporate Defendants, with the aid of the Individual Defendants, are trying to acquire Merrill's GCIAS business, without consideration, through a corporate raid and unfair competition (i.e., by unlawful means). Merrill is likely to succeed on the merits of its claims because Defendants have misappropriated and are using Merrill's trade secrets and confidential information to solicit Merrill's clients and employees in breach of their statutory, contractual, and common law obligations.

### 1.    Merrill will prevail on its trade secret claims.

Merrill is likely to succeed on the merits of its trade secret claims because it can prove under state and federal law that (1) it possessed trade secrets; and (2) Defendants misappropriated and used the trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and the Georgia Trade Secrets Act ("GTSA").

The DTSA provides a cause of action for misuse of trade secrets related to a product or service used in interstate commerce. See 18 U.S.C. §§ 1831, 1836(b). The Act defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" that derive "independent economic value" from "not being generally known" or "readily ascertainable through proper means by another person" and whose owner "has taken reasonable measures" to keep secret. Id. § 1839(3). The GTSA defines trade secrets in functionally identical terms. See O.C.G.A. § 10-1-761(4).

Merrill's compilations of client information include, but are not limited to, client account names, numbers, and contact information; proprietary investment strategies; customer risk tolerances; customer financial information; and the like. See Nies Affidavit at ¶ 25. Such information is not generally known or readily ascertainable by proper means, and Merrill derives substantial value from it.

Merrill reasonably protects this information by, among other things, requiring all employees, as a condition of employment, to attest to confidentiality obligations, by allowing access to the information only on a need-to-know basis, and by restricting internal access to such information through security software, dual access verifications, password and username protections, and other technologies. See Nies Affidavit at ¶ 27. Thus, this information constitutes trade secrets under the DTSA and GTSA.

"Misappropriation" includes actual or threatened misuse of trade secrets by a person who acquires knowledge of the trade secret "under circumstances giving rise to a duty to maintain its secrecy or limit its use." O.C.G.A. §§ 10-1-761(2)(B)(ii)(II); 10-1-762(a); Smart Profitability Solutions, LLC v. Double Check Risk Solutions, LLC, No. 1:18-CV-706-MHC, 2018 U.S. Dist. LEXIS 244828 (N.D. Ga. Aug. 2, 2018) (enjoining former employee overseeing sales from possessing or using information on customer lists); NCR Corp. v. Manno, No. 3:12-cv-121-TCB, 2012 U.S. Dist. LEXIS 196750, at *21 (N.D. Ga. Oct. 26, 2012) ("[I]mproper acquisition by a former employee is enough to establish misappropriation."). "Misappropriation" is similarly defined under DTSA. See 18 U.S.C. § 1839(3).

The Individual Defendants gained access to Merrill's trade secrets while employed with GCIAS. They knew, pursuant to the agreements and policy acknowledgements signed during the course of their many years of employment, that Merrill's customer-related information is confidential, valuable, and protected (i.e., trade secret). See Nies Affidavit at ¶ 37. Nevertheless, they disclosed and misused Merrill's trade secrets to further their interests and those of the Corporate Defendants to harm Merrill. For example, the Individual Defendants shared with Dynasty and Schwab sensitive GCIAS business compilations to gauge Dynasty's interest in partnering with OpenArc. See Nies Affidavit at ¶ 35. The senior leaders of GCIAS

used similar information to prepare pitch presentations to other GCIAS personnel to convince them to jump ship to the competition. See Nies Affidavit at ¶ 36.

These actions constitute misappropriation under DTSA and GTSA because the Individual Defendants violated their duty to maintain the confidentiality of Merrill's trade secrets and used or disclosed them to the Corporate Defendants in violation of their duty to maintain secrecy. 18 U.S.C. § 1839(5)(B)(i); 1839(5)(B)(ii)(II); 1839(6). The GTSA expressly contemplates the entry of injunctive relief under circumstances such as those presented in this case to protect against ongoing acts of misappropriation. O.C.G.A. § 10-1-762.

### 2.    Merrill will prevail on its claim for tortious interference with its business relations with customers and prospects.

"To recover under a theory of tortious interference with business relations, a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a *third party or parties* not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." Renden, Inc. v. Liberty Real Estate P'ship, 213 Ga. App. 333, 334, 444 S.E.2d 814, 817 (1994) (emphasis in original).

Merrill has significant and vital business relationships and expectancies with customers and prospective customers. See Nies Affidavit at ¶ 18. The Individual Defendants have knowledge of those relationships and expectancies. Id. at ¶¶ 19-22. Moreover, because the Individual Defendants founded OpenArc and colluded with

Dynasty and Schwab, those other entities have specific knowledge of Merrill's business relations with its clients.

Defendants have maliciously and intentionally acted to prevent Merrill from developing and maintaining its business relations with its clients and prospects. Defendants have willfully and intentionally solicited Merrill's clients and prospects, inducing and pressuring them to leave (or not to engage with) GCIAS and become clients of OpenArc. <u>See</u> Nies Affidavit at ¶ 39. Defendants have prevented Merrill from developing and pursuing business relationships with its own legacy clients and prospective clients, all to Merrill's detriment.

### 3. Merrill will prevail on its claim for tortious interference with Merrill's contractual relations with employees.

To prove a claim for tortious interference with contractual relations, plaintiff must prove: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." <u>Refresco Bevs. US Inc. v. Califormulations, LLC</u>, No. 4:20-CV-181 (CDL), 2021 U.S. Dist. LEXIS 180600, at *48-49 (M.D. Ga. Sept. 22, 2021) (quotation omitted).

Merrill had an employer-employee relationship with the Individual Defendants and the other GCIAS employees, which included contractual obligations to properly maintain Merrill's confidential information and trade secrets. See Nies Affidavit at ¶ 37. The Individual Defendants maliciously and intentionally solicited Merrill's employees to resign from Merrill, using tactics including threats, coercion, and financial incentives, all with the endorsement and active support of the Corporate Defendants. See Nies Affidavit at ¶ 30. The Individual Defendants also encouraged and/or assisted one another to misappropriate Merrill's confidential information and trade secrets for the benefit of themselves and the Corporate Defendants. Id. By doing so, Defendants have prevented Merrill from maintaining its employment relationships. Defendants' conduct continues to harm Merrill.

### 4. Merrill will prevail on its claim for breach of duty of loyalty.

Employees, including at-will employees, owe a fiduciary duty of loyalty to their employers and may not solicit customers or directly compete for business while still employed. Tom's Amusement Co. v. Total Vending Servs., 243 Ga. App. 294, 295-96, 533 S.E.2d 413, 416-17 (2000). An employee "is not…entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." White v. Shamrock Bldg. Sys., Inc., 294 Ga. App. 340, 346, 669 S.E.2d 168, 174 (2008). Such

activity constitutes a breach of the duty of loyalty. <u>See</u> <u>Sitton v. Print Direction, Inc.</u>, 312 Ga. App. 365, 372, 718 S.E.2d 532, 549 (2011).

The Individual Defendants breached their duty of loyalty to Merrill by, among other misconduct, competing against Merrill while employed at the firm; improperly sharing Merrill's confidential/proprietary and trade secret information; soliciting other Merrill employees; and taking other actions intentionally designed to divert existing business and future business opportunities away from Merrill. <u>See</u> Nies Affidavit at ¶ 30. The Individual Defendants' breaches continue to harm Merrill.

### 5. Merrill will prevail on its breach of contract claim.

The elements for a breach of contract claim are "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." <u>Kuritzky v. Emory Univ.</u>, 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (2008). The Individual Defendants signed various agreements and policy acknowledgements with Merrill to protect against the unlawful use and disclosure of Merrill's confidential, proprietary, and trade secret information regarding the GCIAS business, including, but not limited to, the customers serviced by GCIAS, their assets, revenue, profit generation, investments, and investment goals. <u>See</u> Nies Affidavit at ¶ 37. The Individual Defendants agreed that they would not use such information for a purpose other than for business on behalf of Merrill (<u>see</u> <u>id.</u>); yet

they have disclosed and misused that information to advance the interests of the Corporate Defendants and themselves.

Rather than comply with their contractual obligations to safeguard Merrill's information and refrain from soliciting Merrill's clients and employees, the Individual Defendants acted in bad faith to prioritize their own financial interests, and those of the Corporate Defendants, over Merrill's interest, without any basis or privilege to do so, in breach of their agreements with Merrill.

### 6.    Merrill will prevail on its claim for unfair competition/raid.

The Corporate Defendants' solicitation of the Individual Defendants and other GCIAS employees, and its diversion of Merrill customers and goodwill, assets under management, revenue, and commissions, is a deliberate attempt to damage Merrill. This conduct violates industry standards and common law, which prohibit unjust, inequitable, and unfair competition.

The Corporate Defendants accomplished the raid through the use of large monetary incentives offered to the Individual Defendants and other employees. See Nies Affidavit at ¶ 32. As a result of this unlawful predation, Merrill has suffered harm, including irreparable economic damages, and the loss of key employees, customers, revenue, goodwill, and reputation. The Corporate Defendants knew that its raid of GCIAS was unfair and violated state law and industry standards. FINRA, NASD, and NYSE arbitration panels have repeatedly sanctioned securities firms for

raiding conduct. Rather than invest the years, effort, money, and other resources to develop a successful GCIAS-type business, the Corporate Defendants instead took a shortcut by raiding Merrill's GCIAS business—its fully-trained, developed, experienced, and seasoned employees and its investment in and establishment of an institutional consulting and retirement business. The Corporate Defendants seek to unjustly harvest and enjoy the profits from the substantial resources that Merrill has invested in this business.

The Individual Defendants, acting in concert with, and at the direction and for the benefit of, the Corporate Defendants, and using Merrill's confidential and proprietary information and trade secrets, conspired to solicit and induce Merrill's employees to resign from Merrill and accept employment with OpenArc.

Defendants took these steps with the intention of, and for the purpose of, *inter alia*, (1) raiding and causing harm to Merrill; and (2) misappropriating Merrill's confidential and proprietary information and trade secrets. The Defendants' foregoing conduct constitutes unfair methods of competition.

### 7.    Merrill will prevail on its conspiracy claim.

"To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy." Bellomo v. Tech Mahindra (Ams.), Inc., 374 Ga. App. 199, 205, n.7, 912 S.E.2d 82, 89, n.7

(2025) (quotation omitted). Here, Defendants agreed and conspired to engage in unlawful trade practices and unfair competition to eliminate lawful competition, all to the detriment of Merrill, as described herein, in the Verified Complaint, and in the Nies Affidavit.

### 8.    Merrill will prevail on its claim for breach of the Protocol.

The Protocol for Broker Recruiting, signed in 2004 by Merrill and other brokerage firms, is a limited forbearance agreement among certain industry firms under the terms of which Protocol-signatory firms agree to forego litigation against departing brokers and each other, but only in cases where the brokers and the hiring signatory firms specifically abide by the Protocol's terms and act in good faith. See Verified Complaint at section E. Protocol firms constructed those terms with great care to ensure compliance with privacy laws and regulations.

The Protocol is intended to protect the privacy of confidential customer information by preventing financial advisors and hiring firms from running afoul of industry regulations regarding the security of confidential customer information, especially customer financial data. Id. Specifically, a financial advisor preparing to resign must: (1) create a list consisting only of "client name, address, phone number, email address, and account title"—the "Protocol List"; and (2) create an identical list that also contains client account numbers. On the day of resignation, the financial advisor must deliver the list containing account numbers to the office manager of

21

the firm from which he or she is resigning. The departing financial advisor takes the Protocol List without the account numbers. Critically, the departing financial advisor is not permitted to remove any customer or proprietary information other than the Protocol List upon departure. Id.

In this case, Defendants violated the Protocol. By virtue of the Individual Defendants' nefarious pre-resignation conduct, they forfeited their eligibility to invoke the protections of the Protocol. The Individual Defendants knowingly acted in bad faith. Moreover, by encouraging and assisting the Individual Defendants to violate the Protocol, the Corporate Defendants violated their agreement to abide by the Protocol. As such, they have deliberately waived its protections, Merrill will succeed on its claim, and Defendants must be enjoined.

### B. Merrill Will Suffer Irreparable Harm Absent Injunctive Relief.

Merrill will suffer irreparable harm if this Court does not enjoin Defendants from further misappropriation of Merrill's trade secrets and from continuing to exploit Merrill's confidential information to solicit Merrill's customers and employees. "Loss of confidential and proprietary information is per se irreparable harm." G.W. Henssler & Assocs., Ltd. v. Marietta Wealth Mgmt., LLC, No. 1:17-cv-2188-TCB, 2017 U.S. Dist. LEXIS 220400, at *15 (N.D. Ga. Oct. 23, 2017); Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc., 793 F. Supp. 2d. 1302, 1312 (N.D. Ga. June 3, 2011) (finding former employer likely to suffer

irreparable injury based on departed employee's covert email to herself containing patient lists and information, though former employer did not present any direct evidence of employee's use of that information to solicit patients); BellSouth Telecomms, Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005) (finding the loss of customers and goodwill is an irreparable injury); see also Capital Inventory v. Green, No. 1:20-CV-3224-LMM, 2020 U.S. Dist. LEXIS 256051, at *25 (N.D. Ga. Sept. 16, 2020) ("The Court agrees with Plaintiff that the prospective loss of customers and employees is not an injury that damages can adequately repair. The Eleventh Circuit has held that 'the loss of customers and goodwill is an irreparable injury.' [internal citations omitted]. Courts have made similar findings with respect to employees."); Mohr v. Bank of New York Mellon Corp., 393 Fed. App'x 639, 646 (11th Cir. 2010) ("the loss of customers and goodwill is an irreparable injury") (citation omitted).

Defendants' scheme to solicit Merrill's GCIAS employees and business demonstrates their intent to run afoul of all rules of good faith and fair play, including their common law and contractual obligations to Merrill. Only an order immediately enjoining Defendants from misappropriating Merrill's trade secrets, soliciting Merrill's clients, soliciting Merrill's employees, and requiring the return of records will prevent additional irreparable harm to Merrill.

**C.     The Balancing of Harms Weighs in Merrill's Favor and Injunctive Relief Serves the Public Interest.**

The irreparable harm to Merrill if it is not awarded injunctive relief—specifically the continued loss of employees, customers, and its confidential information and trade secrets—far outweighs any harm to Defendants if the Motion is granted. An injunction protects Merrill's confidential and trade secret information, including contract rights and relationships with customers and employees, goodwill, and business reputation. Neither temporary nor permanent injunctive relief would cause unfair harm to Defendants. Merrill's clients are not clients of the Defendants. The Defendants have no legal right to use Merrill's confidential information and trade secrets, provide them to a third party, and use them to solicit Merrill's clients.

The relief Merrill seeks will not impose a burden on Defendants, who will merely have to abide by their statutory, contractual, and common law obligations. See Mohr., 393 Fed. App'x at 646 (finding no harm to employee where he can continue to conduct business outside of contractual restrictions); Deutsche Bank Sec. v. Pruitt, No. 1:11-cv-04434-SCJ, 2012 U.S. Dist. LEXIS 203105, at *17 (N.D. Ga. Jan. 5, 2012) (finding a former employee's loss of income did not outweigh the loss the former employer would suffer as a result of its former employee's continued solicitation). Merrill does not seek to prevent Defendants from earning a living as financial advisors, even with a company that directly competes with Merrill. Merrill seeks only to enjoin Defendants' unlawful conduct.

24

Merrill has a legitimate public interest in keeping certain information confidential and businesses have the right to protect their confidential and trade secret information as well as their business goodwill. Priority Payment Systems, LLC v. SignaPay, LTD, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016); see also Specialty Chems. & Servs. v.Chandler, 1:87-cv-2338-MHS, 1988 U.S. Dist. LEXIS 16090, at *15 (N.D. Ga. Sept. 26, 1988) ("[T]here is a cognizable public interest in discouraging employees from succumbing to the temptation of easy profit by breaching their employer's trust and misappropriating proprietary information for their own gain"). Moreover, the issuance of an injunction will promote the public interest in protecting confidential information and trade secrets that is reflected by the adoption of the Georgia Trade Secrets Act.

Accordingly, enjoining Defendants would serve the public interest.

## III.    CONCLUSION

For the foregoing reasons, Merrill requests that the Court enter the relief set forth in the proposed Temporary Restraining Order attached to the Motion.

Respectfully submitted, this 24th day of September, 2025.

/s/ Tala Amirfazli
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com
**BURR & FORMAN LLP**
1075 Peachtree Street NE,
Suite 3000
Atlanta, Georgia 30309

25

Telephone: (404) 815-3000
Facsimile: (404) 817-3244

Rachael L. Carp (*pro hac vice* application forthcoming)
Christopher S. Koller (*pro hac vice* application forthcoming)
Benjamin S. Levine (*pro hac vice* application forthcoming)
**RUBIN, FORTUNATO & HARBISON P.C.**
1200 Liberty Ridge Drive, Suite 220
Wayne, PA 19087
(610) 408-2010/2020/2057
ckoller@rubinfortunato.com
rcarp@rubinfortunato.com
blevine@rubinfortunato.com
*Counsel for Plaintiff Merrill Lynch, Pierce, Fenner & Smith Incorporated*

## CERTIFICATE OF COUNSEL

I hereby certify that the foregoing document has been computer processed with 14-point Times New Roman font in compliance with the United States District Court for the Northern District of Georgia Local Rule 5.1(C)

Respectfully submitted, this 24th day of September, 2025.

/s/ Tala Amirfazli
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com

**BURR & FORMAN LLP**
1075 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September, 2025, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record, with a courtesy copy to the following counsel for defendants presently known to the undersigned:

Michael D. Bressan
mbressan@shumaker.com
Jarrod J. Malone
jmalone@shumaker.com
Michael S. Taaffe
mtaaffe@shumaker.com
Charles A. Wood, Jr.
cwood@shumaker.com
**SHUMAKER, LOOP &
KENDRICK, LLP**
240 South Pineapple Avenue, 9th Floor
Sarasota, FL 34236
P.O. Box 49948
Sarasota, FL 34230
*Counsel for certain Individual
Defendant(s)*

Joseph Alonso
jalonso@alonsowirth.com
**ALONSO & WIRTH LAW, LLC**
1708 Peachtree St. NE, Suite 207
Atlanta, GA 30309
*Counsel for Emily Fletcher*

*s/Tala Amirfazli*
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com
Attorney for Defendant
*Counsel for Plaintiff Merrill Lynch,
Pierce, Fenner & Smith Incorporated*

28

**BURR & FORMAN, LLP**
1075 Peachtree Street NE, Suite 3000
Atlanta, GA 30309
Telephone: (404) 815-3000
Facsimile: (404) 817-3244