# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA**

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | ) ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| ERIK BJERKE, JEFFREY CROWELL, CHAD PIGG FIFE, EMILY FLETCHER, BRITTANY HARTNETT, KEVIN HIGGINBOTHAM, JAMES KAUFMAN, JEFFREY NEUMEYER, STEVEN PREDILETTO, JOSEPH SACCO, MICHAEL SONTAG, ELIZABETH WHITE, OPENARC CORPORATE ADVISORY, LLC, DYNASTY FINANCIAL PARTNERS, LLC and CHARLES SCHWAB & CO., INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

Defendants.

**AFFIDAVIT OF MICHAEL NIES**

I, Michael Nies, being duly sworn according to law, do depose and state as

follows:

1

1.      I am the Market Executive for the Atlanta GCIAS office of Merrill

Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") (collectively, Merrill and

its Bank of America affiliates are the "Company").  I am the Merrill executive

responsible for overseeing the Global Corporate Institutional & Advisory Services

("GCIAS") business and I am very familiar with the Individual Defendants, Erik

Bjerke, Jeffrey Crowell, Chad Pigg Fife, Emily Fletcher, Brittany Hartnett, Kevin

Higginbotham, James Kaufman, Jeffrey Neumeyer, Steven Prediletto, Joseph

Sacco, Michael Sontag, and Elizabeth White.

2.      I have been employed with Merrill for approximately 17 years.

Specifically, I worked for Merrill from 1998-2004, 2006-2007, and from 2016 to

the present. I have served as the Market Executive in the Atlanta GCIAS office

since January 1, 2016.

3.      I submit this Affidavit in support of Merrill's motion for injunctive

relief against Defendants.

4.      As the Market Executive, I am familiar with the Individual

Defendants, the contracts and team agreements they signed, the structure of

GCIAS, and the unique nature of the GCIAS business model. I am also familiar

with the facts concerning the Individual Defendants' imminent plan to resign from

Merrill and solicit other GCIAS employees to move to their newly formed

registered investment advisor ("RIA"), which I understand will be affiliated with

Dynasty Financial Partners ("Dynasty") and is being referred to as "OpenArc".

## A. The Individual Defendants and GCIAS

5.     Erik M. Bjerke was a Managing Director and senior leader in

Merrill's GCIAS group and had been employed by Merrill for 27 year until he

resigned.

6.     Jeffrey Crowell, was a Managing Director and leader of Merrill's

GCIAS group and had been employed by Merrill for 12 years until he resigned.

7.     Chad Pigg Fife was a Managing Director and leader of Merrill's

GCIAS group and had been employed by Merrill for 19 years until he resigned.

8.     Emily Fletcher was a Managing Director, senior partner, and "COO"

for Merrill's GCIAS group and had been employed by Merrill for 30 years until

she resigned.

9.     Brittany Hartnett was a Managing Director and leader of Merrill's

GCIAS group and had been employed by Merrill for 16 years until she resigned.

10.     Kevin W. Higginbotham was a Managing Director and a leader of

Merrill's GCIAS group and had been employed by Merrill for 26 years until he

resigned.

11.    James Kaufman was a Managing Director and self-denoted "senior leader" in Merrill's GCIAS group and had been employed by Merrill for 26 years until he resigned.

12.    Jeffrey Neumeyer was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 24 years until he resigned.

13.    Steven Prediletto was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 25 years until he resigned.

14.    Joseph Sacco was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 31 years until he resigned.

15.    Michael Sontag, was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 19 years until he resigned.

16.    Elizabeth White was a Managing Director and leader of Merrill's GCIAS group and had been employed by Merrill for 17 years until she resigned.

17.    Merrill employs approximately 170 people in GCIAS.  Fletcher, Fife, Kaufman, Hartnett, Crowell, Bjerke, Neumeyer, Higginbotham, Prediletto, Sontag, Sacco, and White are Managing Directors and senior leaders within GCIAS.

18.    GCIAS provides Merrill-affiliated products and services to Merrill clients that include U.S. and international corporations, ultra-high net worth and mass affluent individuals and families, and institutions that range in size from small businesses to large, multi-national conglomerates.

4

19.    Working with GCIAS creates a unique opportunity for financial advisors to service distinct types of clients: (a) 401(k), RSU, stock benefit, or other retirement or equity plans sponsored by corporations and institutions (the "Plans"); and (b) individual executives and employees who participate in retirement, benefit, or other plans sponsored by a corporate client of Merrill (the "downstream accounts").

20.    The financial advisors with GCIAS derive significant compensation from the opportunity to convert Plan participants into downstream accounts.

21.    Notably, unlike many financial advisors at Merrill, those with GCIAS are *given existing* client relationships to service and expand; they are not required or expected to source the clients themselves.

22.    The Individual Defendants typically did not prospect new clients. Instead, they generated six- and seven-figure incomes from the downstream business derived from institutional clients already working with Merrill and internal referrals of potential clients from other segments of the Company.

23.    In fact, Fletcher, Sontag, Sacco, Crowell, Fife, and Neumeyer have been working in non-client-facing roles with GCIAS for at least five years. Sacco, Crowell, and Fife liaise with the Corporate Plans. Fletcher acts as the GCIAS Chief Operations Officer; Sontag acts as the GCIAS Chief Financial Officer; and Neumeyer acts as the GCIAS Chief Investment Officer. Yet they, and the other

senior leaders, draw compensation from nearly all business transacted by GCIAS, big or small.

24.    As a direct result of their employment, GCIAS financial advisors and operational professionals receive access to substantial amounts of confidential and proprietary information.

25.    This information includes compiled client information, client lists, client account names and numbers, investment strategies and objectives, risk tolerances, current investments, past revenues and rates of return, existing or forthcoming products and services, and strategic business plans.

26.    Because of its unique role, Merrill also allows GCIAS access to certain non-public confidential data and information entrusted to Merrill by certain corporate and institutional clients, so that Merrill can manage the clients' compensation and stock benefit plans. GCIAS, including the Individual Defendants, receives access to this information *in addition to* the confidential data that Merrill safeguards for all of its clients.

27.    Given the significant value of and investments in developing its proprietary information, Merrill goes to great lengths to protect its confidential information, and employs a number of security measures and checks and balances to safeguard customer privacy. Specifically, Merrill financial advisors are granted access only to information pertaining to the customers they service. Merrill locks

down its information systems, conducts regular surveys of outgoing data and documents, and prevents employees from inserting a flash drive or connecting an external hard drive to the system. Merrill uses encryption protocols, complex password requirements, and double authentication requirements.

## B. The Individual Defendants Conspired to Leave Merrill and Used High Pressure Tactics to Solicit Other Team Members to Join Them.

28.     In my role as Market Executive, I am privy to information concerning the Individual Defendants' plan, while still employed with Merrill, to resign from Merrill and move the Team to their newly formed Dynasty-affiliated Registered Investment Advisory, OpenArc. It is my understanding that some or all of the Individual Defendants are founding equity partners of OpenArc.

29.     I believe the Individual Defendants' goal was to solicit as many employees working with GCIAS as possible to leave Merrill, along with numerous Plans and thousands of downstream accounts serviced by GCIAS, effectively diverting these employees and clients from Merrill to OpenArc– surreptitiously and without any advance warning to Merrill.

30.     I understand that the Individual Defendants took the following steps – all while still employed with Merrill:

  a.  founded and incorporated wealth management firm OpenArc (an RIA) to compete with Merrill;

b.  identified, leased, and began the build out of new office space to house OpenArc, under Emily Fletcher's direction;

c.  targeted senior members of GCIAS to move to OpenArc and Dynasty and then used those senior members to pitch the departure plan to junior members and support staff;

d.  held meetings in Merrill offices and at the personal residences of James Kaufman and other GCIAS employees to coordinate their departure and persuade other employees to join the move;

e.  required GCIAS employees to execute non-disclosure agreements regarding their "strategic discussions" with Kaufman, Bjerke, Fletcher, Crowell, Higginbotham and other GCIAS senior leaders, which prohibit them from discussing the planned move Merrill;

f.  offered financial and equity incentives to junior members of GCIAS to sign the non-disclosure agreements and commit to the move;

g.  during meetings at GCIAS senior leaders' homes, James Kaufman, Elizabeth White and Brittney Hartnett made Power Point pitch presentations to the captive audience, promising them equity in the business that the Defendants intended to divert from Merrill, increased compensation, and increased prestige;

h.  distributed onboarding packets to GCIAS members who executed the non-disclosure agreements;

i.  used scare tactics to encourage employee departures, such as threats of lawsuits, and spread baseless rumors that Merrill would shut down GCIAS and terminate any junior level employee who remained behind; and

j.  shared confidential and proprietary information concerning Merrill employees and Merrill customers with the Corporate Defendants (as defined in the Verified Complaint).

8

31.    I understand that the Team's move to Dynasty and OpenArc is reportedly important enough to Charles Schwab & Co., Inc. ("Schwab") that Schwab has promised to feed the Individual Defendants corporate equity plan clients and give them access to Schwab clients.

32.    I understand that Dynasty and Schwab helped the Individual Defendants marshal approximately $90 Million in capital funds for their move from GCIAS to OpenArc.

C. **The Individual Defendants Misused Merrill Trade Secret Information.**

33.    While they were employed with Merrill, the Individual Defendants had access to Merrill's proprietary compilations of client information, including but not limited to client account names, client account numbers, contact information for institutional clients, third party money manager identities and contacts, number and identity of plan participants, non-participant identities, participant and non-participant contact information, downstream account and other lead opportunities, proprietary investment strategies, customer risk tolerances, safe harbor information, product offerings, total assets under management invested in each employee-sponsored plans, individual participant account balances, pricing, plan participant eligibility criteria, and customer financial information.

34.     For obvious reasons, Merrill takes significant steps, as described above, to protect this information from disclosure and it not generally known or readily ascertainable by proper means.

35.     I understand that GCIAS senior leaders, including Fletcher, Kaufman, and Higginbotham, shared with Dynasty and Schwab sensitive GCIAS business compilations stored on a local, limited access hard drive on Merrill's system, for the purpose of gauging Dynasty's interest in partnering with OpenArc and securing a financial offer package.

36.     I understand that the GCIAS senior leaders also accessed and repurposed trade secret information on the Merrill system to create "presentations" given to the other Merrill financial advisors and support personnel working with GCIAS, to convince those Merrill employees to jump ship to the competition.

37.     Like all Merrill employees, the Individual Defendants knew, pursuant to the agreements and policy acknowledgements they signed during the course of their many years of employment, that Merrill's customer-related information constitutes trade secrets and proprietary information, not to be used for any purpose other than in the ordinary course of performing duties on behalf of Merrill.

38.     Nonetheless, I understand that they disclosed and misused Merrill's trade secrets to further their and OpenArc's interests and harm Merrill.

10

39.    I understand that the Individual Defendants further planned to use

Merrill's trade secret information to compete with Merrill, solicit its customers and

employees, and impede Merrill's ability to continue supporting institutional

consulting and retirement business.


I declare under penalty of perjury that the foregoing is true and correct.


_____

Michael Nies


Sworn to and Subscribed
Before me this 24th day
of September, 2025

_____
Notary Public


RUTH DANIELS
NOTARY PUBLIC
Dekalb County
State of Georgia
My Comm. Expires Dec. 19, 2026


11